IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Vanessa Delesline, | ) | C/A No.: 1:16-2016-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.     Relevant Background

        A.      Procedural History

        On December 18, 2012, Plaintiff protectively filed an application for DIB in which she alleged her disability began on February 23, 2012. Tr. at 82 and 139–40. Her application was denied initially and upon reconsideration. Tr. at 85–88 and 90–91. On

September 10, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Peggy McFadden-Elmore. Tr. at 26–57 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 5, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–25. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 17, 2016. [ECF No. 1].

       B.     Plaintiff's Background and Medical History

            1.     Background

Plaintiff was 56 years old at the time of the hearing. Tr. at 34. She completed high school. Tr. at 37. Her past relevant work ("PRW") was as a cashier. Tr. at 53. She alleges she has been unable to work since March 13, 2012.[1] Tr. at 30.

            2.     Medical History

Plaintiff reported poor sleep and generalized pain on July 15, 2011. Tr. at 235. Carlysle Barfield, M.D. ("Dr. Barfield"), instructed Plaintiff to start Lyrica and to taper and discontinue Prednisone and Neurontin. *Id.* He informed Plaintiff that he suspected she had fibromyalgia. *Id.* In a letter dated July 18, 2011, Dr. Barfield indicated that he had initially examined Plaintiff on July 1, 2011. Tr. at 237. He stated "[e]xamination revealed tenderness virtually everywhere she was palpated over her torso and extremities

---

[1] Although Plaintiff's application indicates an alleged onset date of February 23, 2012, her attorney stated during the hearing that she was alleging an onset date of March 13, 2012. Tr. at 30.

but no objective abnormalities." *Id.* He indicated he felt Plaintiff likely had fibromyalgia, but that he needed to rule out polymyalgia rheumatica. *Id.*

Plaintiff presented to the urgent care clinic at Nason Medical Center on February 4, 2012. Tr. at 279. She reported a history of chronic back and leg pain and stated her leg pain had worsened over the prior few days. *Id.* Scott Forrester, PA, diagnosed cystitis, back pain, and leg pain. Tr. at 280.

On February 21, 2012, Plaintiff presented to orthopedic spinal surgeon Steven C. Poletti, M.D. ("Dr. Poletti"), with a complaint of constant lower extremity pain that was greater on the left than on the right. Tr. at 229. She endorsed some back pain, but classified her leg pain as much worse. *Id.* She stated her symptoms were exacerbated by all movement and were reduced by lying on her back for a short time. *Id.* Dr. Poletti observed Plaintiff to ambulate slowly and with an antalgic gait. *Id.* He noted she was diffusely tender. *Id.* He indicated Plaintiff was not using an assistive device to ambulate. *Id.* Plaintiff demonstrated no weakness and her reflexes were normal. *Id.* Dr. Poletti noted that magnetic resonance imaging ("MRI") of Plaintiff's cervical spine showed very advanced cervical spondylosis with cord compression. Tr. at 230. He stated a straight-leg raising ("SLR") test was positive on the right. *Id.* He recommended an updated MRI of Plaintiff's lumbar spine. *Id.*

On February 29, 2012, Bennett D. Grimm, M.D. ("Dr. Grimm"), indicated the MRI showed Plaintiff to have fairly stable disc degeneration primarily at L5-S1 with disc collapse that resulted in bilateral foraminal stenosis, worse on the right than the left. Tr. at 227. He noted a loss of disc signal at L3-4 and L4-5 that resulted in minimal collapse and

Modic changes at L5-S1. *Id.* Dr. Grimm observed Plaintiff to have negative bilateral SLR tests; full range of motion ("ROM") of her knees; and full ROM of her hips with pain. *Id.* He assessed lumbar radiculopathy and recommended an epidural steroid injection ("ESI") at L5-S1. *Id.* G. Robert Richardson, M.D., administered a left L5-S1 lumbar ESI. Tr. at 473.

Plaintiff complained to Dr. Barfield of increasing back pain on March 6, 2012. Tr. at 221. She indicated the lumbar ESI had provided no relief. *Id.* She described the pain in her lower back as worse on the left than the right side. *Id.* Dr. Barfield observed Plaintiff to be tender in her lumbar spine. *Id.* He administered a Marcaine injection and instructed Plaintiff to engage in exercises for low back strain. *Id.*

On March 27, 2012, Plaintiff reported she had received some immediate relief from the Marcaine injection, but that the pain in her lower extremities had increased again during the prior week. Tr. at 222. She complained of numbness in her feet with prolonged sitting. *Id.* Dr. Barfield instructed Plaintiff to continue Savella, Lyrica, and Klonopin. *Id.* He discontinued Plaintiff's prescription for Mobic and administered another Marcaine injection. *Id.*

On April 17, 2012, Dr. Poletti indicated Plaintiff's lumbar MRI showed retrolisthesis of L5 on S1 with edema changes in the endplate that were greater on the right than the left. Tr. at 250. He noted that Plaintiff's back pain had increased to the point that she had needed to visit the emergency room ("ER") on several occasions. *Id.* He recommended x-rays and a lumbosacral support. *Id.* He stated surgery was an option,

but he considered it a last resort. *Id.* He recommended Plaintiff consider a rhizotomy procedure. *Id.*

Plaintiff presented to Ellen Rhame, M.D. ("Dr. Rhame"), on April 26, 2012, for an initial pain management consultation. Tr. at 261. She complained of pain in her lower back, buttocks, and posterior lower extremities. *Id.* She indicated the pain was worse in her left lower extremity than her right. *Id.* Plaintiff also reported a history of fibromyalgia and bilateral lower extremity paresthesia. *Id.* She indicated her pain was worsened by standing and affected her sleep and appetite. *Id.* Dr. Rhame observed Plaintiff to have positive Patrick's test bilaterally; full ROM of the hips; multiple trigger points above and below the waistline; tender bilateral lumbar facets; intact bilateral lower extremity sensation; 5/5 lower extremity strength; negative SLR test; and 1+ bilateral patellar and Achilles deep tendon reflexes. Tr. at 263. She noted Plaintiff performed heel and toe walking without difficulty. *Id.* She indicated she would schedule Plaintiff for left-sided L3, L4, and L5 medial branch blocks and S1 and S2 lateral branch blocks for lumbar spondylosis and sacroilitis symptoms. *Id.* She stated she would consider rhizotomy if Plaintiff responded well to the medial and lateral branch blocks. *Id.* She also indicated she would consider referring Plaintiff for physical therapy. *Id.* She prescribed Relafen and Tizanidine and advised Plaintiff to continue taking Lyrica and Savella and to reduce her weight. Tr. at 263–64. Dr. Rhame administered left L3, L4, and L5 medial branch blocks and left S1 and S2 lateral branch blocks on April 30, 2012. Tr. at 268.

Plaintiff reported pain in her lower back and right lower extremity on May 10, 2012. Tr. at 265. She stated it was worse with walking and standing. *Id.* She indicated she

had received no relief from the medial and lateral branch blocks. *Id.* Virginia Blease, PA-C ("Ms. Blease"), observed Plaintiff to have 5/5 musculoskeletal strength in her bilateral lower extremities; intact dorsal and plantar flexion; negative bilateral SLR tests; and normal muscle tone. *Id.* However, she indicated Plaintiff ambulated with an antalgic gait. *Id.* She continued Plaintiff's prescriptions for Relafen and Zanaflex, authorized her to receive a TENS unit, and referred her for physical therapy. *Id.*

On May 22, 2012, Plaintiff reported that her back and leg pain was worsened by standing and reduced by sitting. Tr. at 264. She endorsed some swelling in her lower extremities and indicated she intended to address it with her primary care physician. *Id.* Ms. Blease observed Plaintiff to have 4/5 strength in her bilateral lower extremities; intact dorsal and plantar flexion; negative SLR tests; normal muscle tone; and antalgic gait. *Id.* She recommended a lumbar ESI at L5-S1and prescribed Nucynta for pain. *Id.* On June 4, 2012, Dr. Rhame administered a left L5-S1 lumbar ESI. Tr. at 267.

Plaintiff reported fatigue and lower extremity pain on May 28, 2012. Tr. at 381. She indicated Lyrica was ineffective. *Id.* Monica Lominchar, M.D. ("Dr. Lominchar"), discontinued Zocor and Lyrica. *Id.*

On June 19, 2012, Dr. Poletti indicated Plaintiff had received only some relief from injections and recommended she consider facet rhizotomy. Tr. at 249. He indicated he would discuss the procedure with Dr. Netherton and schedule it in the coming weeks. *Id.*

Plaintiff presented to Dr. Lominchar for surgical clearance on July 13, 2012. Tr. at 377. She complained of left knee pain and edema and requested a prescription for

Flexeril. *Id.* Dr. Lominchar observed no edema. *Id.* She indicated Plaintiff was morbidly obese and that her knee pain was likely caused by osteoarthritis. *Id.* She prescribed Flexeril. *Id.* X-rays showed mild degenerative osteoarthritic changes in the medial joint compartment of Plaintiff's left knee. Tr. at 360.

Plaintiff contacted Dr. Lominchar's office on July 30, 2012, to report that her blood pressure was elevated at 160/104 during a preoperative visit. Tr. at 375. Dr. Lominchar prescribed five milligrams of Norvasc. *Id.*

On August 3, 2012, Plaintiff's blood pressure was 122/76. Tr. at 374. She reported she had not taken Norvasc and indicated her blood pressure was previously elevated because of an argument with her daughter. *Id.* Dr. Lominchar decreased Plaintiff's dosage of Norvasc to two-and-a-half milligrams. *Id.*

Plaintiff underwent surgery on August 6, 2012. Tr. at 272. Prior to the surgery, she reported left lower extremity weakness with numbness. *Id.* Dr. Poletti observed Plaintiff to have a slow, antalgic gait; limited ROM of her lumbar spine with extension; positive SLR test on the left; subjective dysesthesia in the left lower extremity with diminished gastrocnemius muscle function and Achilles reflex; and diminished sensation in the left foot. *Id.* He performed far lateral (transpedicular) decompression at L5-S1; posterior lumbar interbody fusion at L5-S1; placement of machined intervertebral interbody spacer at L5-S1; and pedicle screw instrumentation at L5-S1 using the Globus Revolve pedicle strew fixation system. Tr. at 274. Plaintiff made good progress and met her physical therapy goals following surgery. Tr. at 276. She was discharged on August 8, 2012. *Id.*

On August 17, 2012, Plaintiff presented to East Cooper Medical Center with a complaint of pain in her low back and left leg. Tr. at 304. A computed tomography ("CT") scan of Plaintiff lumbar spine showed postsurgical and degenerative changes at L5-S1, but no complication of the surgical hardware, acute or chronic fracture, pars defect, or spondylolisthesis. Tr. at 308. Kevin Keenan, M.D., released Plaintiff with prescriptions for Zofran and Oxycodone. Tr. at 310.

Plaintiff presented to Amanda Thurber, PA-C ("Ms. Thurber"), in Dr. Poletti's office for her first postoperative visit on August 20, 2012. Tr. at 277. She complained of cramping, numbness, and occasional sharp pain that radiated down her left leg. *Id.* Ms. Thurber reviewed x-rays that showed Plaintiff's instrumentation to be stable. *Id.* She observed Plaintiff to ambulate with a slightly antalgic gait, but without a cane or walker. *Id.* She noted Plaintiff had negative bilateral SLR tests. *Id.* She indicated Plaintiff had symmetric, 5/5 strength and symmetric and intact deep tendon reflexes. *Id.* Ms. Thurber explained to Plaintiff that she was experiencing normal postoperative symptoms. *Id.* She indicated Plaintiff should avoid bending, lifting, or twisting and should wear her brace while she was up and moving about. *Id.*

Plaintiff was tearful and reported significant pain on August 21, 2012. Tr. at 373. She indicated she had followed up with Dr. Poletti's office on the prior day, but had received no assistance. *Id.* Dr. Lominchar indicated she would follow up with Dr. Poletti's office. *Id.*

Plaintiff followed up with Justin Swain, PA-C ("Mr. Swain"), in Dr. Poletti's office on September 17, 2012. Tr. at 484. She reported persistent low back pain and

complications from her medications that included nausea and thrush. *Id.* Mr. Swain indicated Plaintiff had been "somewhat slow to progress overall," but had intact strength and reflexes in her lower extremities. *Id.* He noted x-rays of Plaintiff's lumbar spine showed her fusion and instrumentation to be stable. *Id.*

Plaintiff complained of nausea, weight loss, and a four-week history of sore throat on September 28, 2012. Tr. at 371. She stated the sore throat started after her surgery. *Id.* She indicated she continued to experience chronic back pain that radiated to her bilateral legs and stated her family members were concerned that she was taking too many pills. *Id.* Dr. Lominchar referred Plaintiff for a barium swallow test and prescribed Mobic for back and leg pain and Azithromycin for sore throat. Tr. at 372.

On October 8, 2012, Plaintiff contacted Dr. Lominchar's office to report that Mobic was providing no relief and to request medication for spasms. Tr. at 370. She indicated she was not taking pain medication because she was not eating. *Id.*

A modified barium swallow test was normal on October 16, 2012. Tr. at 414–16.

Plaintiff continued to report pain in her back, hip, and leg on October 22, 2012. Tr. at 485. Mr. Swain observed Plaintiff to ambulate with a slow, antalgic gait; to have limited ROM of her lumbar spine; to demonstrate signs of pain with extension; to have a positive SLR test on the left; and to have intact strength and deep tendon reflexes. *Id.* He indicated Plaintiff's x-rays remained stable. *Id.* Plaintiff stated she had stopped taking her medications, except for a rare Nucynta, because her family members had complained she was oversedated. *Id.* Mr. Swain indicated he would work with Plaintiff to find the right

dosage of medication to control her pain without oversedating her. *Id.* He adjusted her medications accordingly. *Id.*

Plaintiff reported upper chest tightness on November 9, 2012. Tr. at 369. Dr. Lominchar diagnosed atypical chest pain. *Id.*

Plaintiff presented to Bon Secours St. Francis Hospital on November 15, 2012, with chest pain. Tr. at 356. A chest CT scan indicated probable right upper lobe pneumonia. *Id.*

On November 20, 2012, Mr. Swain observed that Plaintiff was "healing slowly overall" and had shown "minimal progress with regards to her back and leg pain." Tr. at 486. He noted Plaintiff was taking Neurontin, Nucynta, and Valium. *Id.* He observed Plaintiff to have a slow, antalgic gait; to demonstrate limited ROM of her lumbar spine; to show signs of pain with extension; to have a positive SLR test; and to show no evidence of worsening or focal neurological deficits. *Id.* He recommended Plaintiff attend physical therapy for modalities and stretching and start the process of weaning out of her brace. *Id.*

Plaintiff followed up with Dr. Lominchar on November 20, 2012. Tr. at 366. She continued to report difficulty swallowing and right upper chest discomfort, but had no shortness of breath. *Id.* Dr. Lominchar indicated Plaintiff had dysphagia and should consult a gastroenterologist. *Id.*

Plaintiff presented to the ER with complaints of chest pain and vomiting on November 24, 2012. Tr. at 394. Steven Feingold, M.D., prescribed Zofran and Phenergan and instructed Plaintiff to resume daily use of Prilosec. Tr. at 398.

Plaintiff followed up with Ryan Aprill, PA-C ("Mr. Aprill"), in Dr. Poletti's office on January 2, 2013. Tr. at 452. She complained of chronic back pain with radiation into her bilateral lower extremities. *Id.* She indicated she continued to wear a brace and to use a cane. *Id.* She stated she spent most of her time "at home caring for her house," but traveled outside her home once or twice a week. *Id.* Mr. Aprill indicated Plaintiff's x-rays were stable. *Id.* He described Plaintiff as "very slow with her movements" and indicated she ambulated with an antalgic gait and used a cane for assistance. *Id.* Plaintiff reported pain with extension and SLR testing. *Id.* Mr. Aprill discontinued Plaintiff's prescription for Valium, prescribed Nucynta and Cymbalta, and referred her for physical therapy for core and lumbar strengthening. *Id.*

Plaintiff presented to physical therapist Trina Kiernan ("Ms. Kiernan"), for an evaluation on January 9, 2013. Tr. at 390. She reported pain on palpation of her lower back and down the lateral aspect of her lower extremities. *Id.* Ms. Kiernan observed Plaintiff to have decreased sensation as a result of numbness and tingling and increased lordosis. *Id.* She noted Plaintiff's lumbar flexion was half of the normal range; her extension was a quarter of the normal range; her right rotation was a quarter of the normal range; her left rotation was half of the normal range; her right lateral bending was a quarter of the normal range; and her left lateral bending was half of the normal range. *Id.* She indicated Plaintiff had normal ROM, strength, deep tendon reflexes, flexibility, and lumbar joint play in her lower extremities, but complained of pain with resistive flexion on the left. *Id.* She stated Plaintiff was unable to walk on her heels or toes and could not perform one-legged balancing. Tr. at 391. Plaintiff demonstrated normal

muscle strength on manual muscle testing, except for 4+/5 strength with left hip flexors and left knee flexion. *Id.* Ms. Kiernan indicated Plaintiff was a good candidate for physical therapy, but that it was too painful for her to complete at that time. *Id.* She referred Plaintiff back to Dr. Poletti for additional imaging studies. *Id.*

Plaintiff complained of dysphagia and low back pain on January 10, 2013. Tr. at 364. Dr. Lominchar noted Plaintiff's pneumonia had resolved. *Id.* She scheduled Plaintiff for a gastroenterology consultation. Tr. at 365.

Plaintiff followed up with Courtney E. Bock, PA-C ("Ms. Bock"), in Dr. Poletti's office on January 15, 2013. Tr. at 451. She reported swelling and increased pain in her lower back. *Id.* Ms. Bock observed no evidence of inflammation, swelling, or hematoma and indicated x-rays showed Plaintiff's fusion to be consolidating well. *Id.* However, she noted Plaintiff was "particularly tender around the L-3 spinous process" and stated this was several inches above her L5-S1 incision. *Id.* She indicated Plaintiff had no bowel or bladder dysfunction and no focal deficits on exam. *Id.* She observed Plaintiff to have limited lumbar ROM; to use a cane for assistance; and to have positive SLR tests bilaterally to reproduce lower back pain at full extension. *Id.* She recommended Plaintiff proceed with a postoperative MRI. *Id.*

On January 24, 2013, an MRI of Plaintiff's lumbar spine revealed mild noncompressive spondylosis at L1-2, L2-3, and L3-4; moderate facet arthropathy and mild diffuse bulge without root compression at L4-5; and evidence of previous surgery at L5-S1, with considerable granulation tissue, but no residual nerve root compression. Tr. at 453–54.

A physical therapy progress note dated February 6, 2013, indicates Plaintiff reported her pain to be an eight on a 10-point scale. Tr. at 387. Ms. Kiernan described Plaintiff as ambulating with an antalgic gait and with the assistance of a cane. *Id.* Plaintiff reported she was unable to stand to cook, sleep for four hours at a time, return to work, shop for groceries, or ambulate without an assistive device, and Ms. Kiernan indicated her goals would be to improve these functions. *Id.*

On March 12, 2013, Plaintiff was discharged from physical therapy after eight sessions and three missed appointments. Tr. at 505. She reported no lasting improvement in her back pain and stated she did not feel like physical therapy was helping. *Id.* She reported that she was unable to perform household chores, cook, walk any distance, or work. *Id.*

Plaintiff followed up with Mr. Swain on March 28, 2013. Tr. at 450. Mr. Swain noted that x-rays of Plaintiff's lumbar spine showed appropriate positioning of the posterior instrumentation and interbody fusion at L5-S1. *Id.* He noted Plaintiff had continued to endorse back pain and minimal leg pain. *Id.* He recommended Plaintiff use a transcutaneous electrical nerve stimulation ("TENS") unit and stated he would consider referring her for a more focused evaluation with pain management, if necessary. *Id.*

Plaintiff presented to Thaddeus J. Bell, M.D. ("Dr. Bell"), for an orthopedic consultative examination on May 1, 2013. Tr. at 457–59. She reported chronic pain and difficulty standing and walking for long periods. Tr. at 457. Dr. Bell observed that Plaintiff "appear[ed] to be in a significant amount of pain" when she removed herself from the chair. Tr. at 458. He noted that she used a cane to walk and to get in and out of

13

the chair. Tr. at 458 and 459. He observed Plaintiff to be "obviously overweight for her height" at 5'2" tall and 208 pounds. Tr. at 458. He indicated her blood pressure was elevated at 148/93. *Id.* He stated Plaintiff "appear[ed] to be very stiff during the examination." *Id.* The ROM of Plaintiff's lumbar spine was reduced to 85 degrees of flexion, 20 degrees of extension, and 25 degrees of lateral flexion.[2] *Id.* An examination of Plaintiff's hips showed reduced ROM to 35 degrees of abduction, 15 degrees of adduction, 90 degrees of flexion, 35 degrees of internal rotation, 45 degrees of external rotation, and 35 degrees of extension.[3] Tr. at 458–59. Dr. Bell noted Plaintiff was uncomfortable in the seated position on the examination table. Tr. at 459. He indicated SLR testing was positive at 45 degrees bilaterally in the sitting and supine positions. *Id.* He noted Plaintiff's grip strength was slightly reduced at 4/5, but that she had no evidence of joint deformity, swelling, or tenderness. *Id.* Plaintiff was able to perform tandem and heel-toe walking, but was only able to perform a partial squat with pain. *Id.* Dr. Bell observed Plaintiff to have 3/5 muscle weakness in her lower extremities and tenderness on her left side. *Id.* He indicated Plaintiff had no muscle atrophy, no joint abnormalities, and 2+ and equal reflexes. *Id.*

On June 11, 2013, state agency medical consultant William Cain, M.D. ("Dr. Cain"), reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment. Tr. at 64–66. He indicated Plaintiff could occasionally lift and/or

---

[2] Normal ROM of the lumbar spine is to 90 degrees of flexion, 25 degrees of extension, and 25 degrees of lateral flexion. Tr. at 455.

[3] Normal ROM of the hips is to 40 degrees of abduction, 20 degrees of adduction, 100 degrees of flexion, 40 degrees of internal rotation, 50 degree of external rotation, and 30 degrees of extension. Tr. at 455.

carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently balance, stoop, and push/pull with her bilateral lower extremities; occasionally climb ramps and stairs, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. Tr. at 64–65. He further indicated Plaintiff should avoid all exposure to hazards. Tr. at 65. State agency medical consultant Hugh Wilson, M.D. ("Dr. Wilson"), assessed the same physical RFC on July 22, 2013. Tr. at 77–79.

Plaintiff continued to report chronic low back pain and bilateral leg symptoms on August 7, 2013. Tr. at 461. She also reported a new onset of neck pain. *Id.* She complained of leg weakness, but denied having sustained falls. *Id.* Ms. Bock observed Plaintiff to have no neurological deficits in her upper extremities. *Id.* She noted Plaintiff had overall weakness with questionable effort on examination. *Id.* She referred Plaintiff for an MRI of her cervical spine. *Id.*

Plaintiff presented to James K. Aymond, M.D. ("Dr. Aymond"), for an initial visit on September 3, 2013. Tr. at 465. She reported that she had undergone lower back surgery thirteen months earlier, but had experienced no significant improvement in her lower back symptoms. *Id.* She also reported posterior neck pain, but denied that the pain was radiating to her upper extremities. *Id.* Dr. Aymond noted "[p]atient is employed as a cashier at Cos[t]co warehouse and does a significant amount of standing as well as twisting and bending." *Id.* He observed Plaintiff to have full ROM of her neck; to walk with a normal heel-to-toe gait; and to be able to heel and toe walk without difficulty. *Id.* He stated ROM of Plaintiff's lumbar spine was 70–80% of normal and ROM of her

cervical spine was 90% of normal. *Id.* He indicated she had normal sensation to light touch and pinprick in her cervical and lumbar dermatomes. *Id.* He noted x-rays of Plaintiff's cervical spine revealed multilevel disc degeneration with disc space narrowing and anterior osteophyte formation from C3 to T1. Tr. at 466. He recommended Plaintiff engage in physical therapy two to three times per week. *Id.*

On September 26, 2013, Dr. Poletti authorized Plaintiff to return to work with modified duties. Tr. at 472.

On October 15, 2013, Dr. Aymond noted that Plaintiff had been unable to start physical therapy because of a problem with insurance coverage. Tr. at 463. He observed Plaintiff to have moderately limited mobility of her cervical spine, discomfort with SLR tests, and normal motor strength and sensation. *Id.* He instructed Plaintiff to notify him when her insurance would allow for physical therapy and that he would refer her again at that time. *Id.*

On January 15, 2014, Plaintiff complained of pain in her neck and low back and more frequent low back spasms. Tr. at 470. She described the pain as being sharp and in the center of her back. *Id.* She indicated it was not constant, but was worse when she was trying to sleep. *Id.* She reported that her pain was worse in her right leg and on the right side of her neck. *Id.* Plaintiff indicated she could not afford to obtain the cervical MRI that had been recommended at her last visit. *Id.* She reported taking Nucynta twice a day for pain control and Zanaflex twice a day for muscle spasms. *Id.* She stated she did not take her medications as prescribed if she was going to be away from her home. *Id.* Mr. Aprill observed Plaintiff to ambulate with a slightly antalgic gait; to have a positive SLR

16

test bilaterally; to have no worsening neurological deficits; to be able to toe and heel rise without difficulty; to have limited ROM of the cervical and lumbar spine; to have negative Hoffman's sign bilaterally; and to have no worsening deficits in strength. *Id.* He noted Plaintiff indicated she had been more active recently, and he advised her to take it as easy as possible over the next few weeks. Tr. at 470–71. He gave Plaintiff samples of Duexis and indicated he would prescribe the medication regularly if she benefitted from it. *Id.* An x-ray showed post-laminectomy syndrome in Plaintiff's lumbar region and cervical spondylosis without myelopathy. Tr. at 469.

Plaintiff presented to Matt Erickson, M.D. ("Dr. Erickson"), as a new patient on February 4, 2014. Tr. at 577. She reported chest discomfort and right leg pain. *Id.* She indicated that her leg pain was worsened by walking. *Id.* Dr. Erickson administered a Toradol injection and prescribed Naproxen and Prednisone. *Id.* He instructed Plaintiff to follow up in two days. *Id.* On February 6, 2014, Plaintiff complained of fibromyalgia and pain on the right side of her ribs and in her chest wall. Tr. at 575. Dr. Erickson ordered a chest CT scan. *Id.*

Plaintiff presented to Henry Spradlin, M.D. ("Dr. Spradlin"), on April 9, 2014, with complaints of chest congestion and cough. Tr. at 572. Dr. Spradlin diagnosed cough, wheezing, and pneumonia. *Id.* He administered a Duoneb treatment and Recephin and Decadron injections. *Id.* He prescribed an Albuterol inhaler, Levaquin, Prednisone, and Hycodan syrup. *Id.* On April 10, 2014, Eleanor R. Jenkins-Alford ("Dr. Jenkins-Alford"), administered a nebulizer treatment and advised Plaintiff to follow up the next day. Tr. at 570–71. Dr. Spradlin indicated Plaintiff's pneumonia was improving on April 11, 2014.

17

Tr. at 568. On April 15, 2014, Dr. Jenkins-Alford prescribed Singulair and Nasacort and indicated Plaintiff's pneumonia was moderately better. Tr. at 565.

Plaintiff presented to the ER at Roper St. Francis Healthcare on May 4, 2014, with complaints of abdominal pain, nausea, diarrhea, fever, and vomiting. Tr. at 521. The attending physician diagnosed a bladder infection and prescribed Cipro. Tr. at 522.

On May 30, 2014, Plaintiff complained of a two-month history of stomach pain and diarrhea. Tr. at 546. Dr. Lominchar observed no abnormalities on physical examination. Tr. at 546–48. She prescribed Xifaxan and referred Plaintiff for lab work. Tr. at 548.

Plaintiff reported frequent urination and pain in her chest, left leg, and right side on July 25, 2014. Tr. at 538. Dr. Lominchar observed no abnormalities on examination. Tr. at 538–40. She assessed dyslipidemia, vitamin D deficiency, diarrhea, and anemia and refilled Plaintiff's medications. Tr. at 545.

Plaintiff presented to the ER at Roper St. Francis Healthcare with anterior chest wall pain and nausea on September 8, 2014. Tr. at 582. The attending physician suspected Plaintiff's pain was related to fibromyalgia. Tr. at 583. He discharged her with prescriptions for Percocet and Zofran. *Id.*

C.      The Administrative Proceedings

1.      The Administrative Hearing

a.      Plaintiff's Testimony

At the hearing on September 10, 2014, Plaintiff testified she was 5'3" tall and weighed 210 pounds. Tr. at 36. She stated her normal weight was 168 pounds, but her medications had caused her to gain weight. *Id.*

Plaintiff indicated she had lumbar fusion surgery in August 2012. Tr. at 46. She stated her pain did not improve after the surgery. *Id.* She described her pain as a seven on a 10-point scale. Tr. at 48. She indicated she had difficulty falling asleep and that the amount of sleep she obtained varied from night to night. Tr. at 43.

Plaintiff testified she could walk for 10 minutes. Tr. at 44. She stated she could stand for three to five minutes and sit for three to five minutes at a time. *Id.* She indicated she experienced numbness in her legs if she sat for too long. Tr. at 44–45. She testified she often alternated between sitting, standing, and walking. Tr. at 51. She indicated she was most comfortable sitting with her feet propped up. *Id.* She stated she occasionally used a cane to ambulate. Tr. at 50–51.

The ALJ questioned Plaintiff about a notation in the record that she did not take her medications when she was not planning to be home for the whole day. Tr. at 40. Plaintiff testified she spent most of her days at home and did not normally travel. *Id.* She indicated she did not take her medications when she traveled to places where she felt like she needed to be alert. *Id.*

Plaintiff testified she had a driver's license and drove approximately three times per week. Tr. at 37. She stated she cooked once or twice a week and did laundry once a week. Tr. at 42. She denied going grocery shopping. *Id.* She stated she watched television, used a computer, and played word games during the day. Tr. at 52.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Tonetta Watson-Coleman reviewed the record and testified at the hearing. Tr. at 52–55. The VE categorized Plaintiff's PRW as cashier, *Dictionary of Occupational Titles* ("*DOT*") number 211.462-014, as requiring light exertion and having a specific vocational preparation ("SVP") of three. Tr. at 53. The ALJ asked if Plaintiff's work as a cashier generated skills that were readily transferable to skilled or semiskilled work at the sedentary exertional level. *Id.* The VE stated it did not. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand or walk for about six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; could frequently push and pull with the bilateral lower extremities; could never climb ladders, ropes, or scaffolds; could frequently balance and stoop; could occasionally climb ramps and stairs, kneel, crouch, and crawl; and should avoid all exposure to hazards. Tr. at 54. The ALJ asked if the hypothetical individual would be able to perform Plaintiff's PRW. *Id.* The VE stated that the individual could perform work as a cashier. *Id.*

The ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who could lift or carry 10 pounds occasionally and less than 10 pounds

frequently; could stand and walk for at least two hours in eight-hour workday; could sit for about six hours in an eight-hour workday; could frequently push and pull with the bilateral lower extremities; could never climb ladders, ropes, or scaffolds; could frequently balance and stoop; could occasionally climb ramps and stairs, kneel, crouch, and crawl; and should avoid all exposure to hazards. Tr. at 54–55. The ALJ asked if the individual would be able to perform Plaintiff's PRW. Tr. at 55. The VE stated the individual could not. *Id.*

The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited as stated in Plaintiff's testimony. *Id.* She asked if the individual would be able to perform claimant's PRW or any other work available in the local or national economy. *Id.* The VE stated that the individual would be unable to retain employment. *Id.*

2.    The ALJ's Findings

In her decision dated December 5, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
2.    The claimant has not engaged in substantial gainful activity since March 13, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has the following severe impairments: degenerative disc disease; status post L5-S1 fusion; and obesity (20 CFR 404.1520(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). Specifically, the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit for about 6 hours in an 8-hour day; and stand/walk for about 6 hours in an 8-hour day. The claimant can

push and pull frequently with the bilateral lower extremities; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance and stoop; and occasionally kneel, crouch, and crawl; with the need to avoid all hazards such as machinery and heights.

6. The claimant is capable of performing past relevant work as a cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from March 13, 2012, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 12–20.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly consider the opinion of Plaintiff's treating physician;

2)    the ALJ did not adequately assess Plaintiff's credibility; and

2)    the ALJ erred in assessing Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

22

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Treating Physician's Opinion

Dr. Poletti completed a form on March 23, 2012. Tr. at 247. He indicated Plaintiff's diagnoses were lumbar disc disorder and myelopathy. *Id.* He stated Plaintiff had received ESIs. *Id.* He indicated Plaintiff's restrictions included no pushing, pulling,

bending, twisting, or lifting. *Id.* He stated the restrictions began on February 29, 2012, and were estimated to continue until April 23, 2012. *Id.*

On May 11, 2012, Dr. Poletti indicated Plaintiff was out of work and that her restrictions included no pushing, pulling, bending, twisting, or lifting. Tr. at 248. On September 17, 2012, Dr. Poletti stated Plaintiff was to remain out of work. Tr. at 278.

Dr. Poletti completed a disability claim form on October 19, 2012. Tr. at 244–46. He stated Plaintiff had been diagnosed with lumbar disc disorder and had undergone an L5-S1 posterior lumbar interbody fusion surgery on August 6, 2012. Tr. at 244. He indicated Plaintiff was restricted from pushing, pulling, lifting, reaching, bending, and twisting and should engage in no prolonged sitting or standing. Tr. at 245. He stated Plaintiff was "out of work" beginning February 21, 2012. *Id.* He indicated that an MRI of Plaintiff's lumbar spine showed spondylosis, left foraminal disc herniation, and listhesis on August 6, 2012. *Id.* He indicated Plaintiff had recently undergone surgery, was taking analgesic medications, and would continue to follow up for monthly post-operative visits. *Id.*

On September 23, 2013, Dr. Poletti authorized Plaintiff to return to work that required no lifting over 15 pounds and no prolonged standing or walking. Tr. at 472.

Plaintiff argues the ALJ failed to consider the relevant factors in 20 C.F.R. § 404.1527(c) in explaining her decision to give little weight to Dr. Poletti's opinion. [ECF No. 16 at 16]. She maintains the ALJ failed to address Dr. Poletti's May and October 2012 opinion statements, which suggested Plaintiff was unable to engage in any work activity. *Id.* at 16–17.

26

The Commissioner argues the ALJ properly accorded little weight to Dr. Poletti's opinion because it was inconsistent with contemporaneous treatment notes. [ECF No. 17 at 20–21].

ALJs must carefully consider medical source opinions of record. SSR 96-5p. The regulations direct that they accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). If a treating source's opinion is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence of record, the ALJ may decline to give it controlling weight. SSR 96-2p. Even if the ALJ determines the treating medical source's opinion is not entitled to controlling weight, she must proceed to weigh it, along with all other medical opinions of record, based on the factors in 20 C.F.R. § 404.1527(c), which include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

Not only does 20 C.F.R. § 404.1527(c) specify the relevant factors to be considered in assessing medical opinions, it also provides guidance in weighing those

factors. A treating source's opinion is entitled to deference and generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2); *see also* SSR 96-2p. Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. § 404.1527(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[6] Finally, medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5).

The ALJ must "always give good reasons" for the weight she accords to the opinion of the claimant's treating medical source. 20 C.F.R. § 404.1527(c)(2). If the ALJ issues a decision that is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical

---

[6] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." SSR 96-2p. This court should not disturb an ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ acknowledged that the record contained a September 26, 2013 medical source statement from Dr. Poletti, in which he opined that Plaintiff "could return to work with modified duties, with no lifting over 15 pounds; and no prolonged standing or walking. (Exhibit 15F)." Tr. at 18. She indicated she accorded little weight to the statement, "as his limitations are inconsistent with physical examinations, specifically the more recent treatment note dated January 15, 2014, and with x-rays." Tr. at 19. The ALJ summarized the findings from the January 15, 2014 exam as follows:

> The claimant reported continued neck and low back pain, with spasms, worse at night. The claimant was noted to be taking Nucynta twice a day; Zanaflex twice a day; Cymbalta; and Lyrica. The claimant stated that she does not take her medication as prescribed if she is going to be out of her home, as she does not like how they make her feel. The claimant reported that she only takes her medications when she is going to be at the house for the entire day. The claimant was noted to be ambulatory with a slightly antalgic gait; positive straight leg raises bilaterally; the ability to toe and heel raise without difficulty; and limited range of motion in the cervical and lumbar spine. Mr. Aprill noted that the claimant suffered from postlaminectomy syndrome, lumbar; and cervical spondylosis, without myelopathy. Mr. Aprill noted that he went over precautions with the claimant regarding bending, lifting, and twisting, and noted that the

claimant reported to being more active, which the claimant attributed to her increased pain. Mr. Aprill advised the claimant that her medication would not effectively help when taken intermittently, and he refilled her medication. (Exhibit 15F).

Tr. at 18–19. She also stated that Plaintiff had reported some leg pain on January 14, 2014, but had denied any radiating pain or weakness. Tr. at 19. The ALJ explained that x-rays of Plaintiff's lumbar spine "revealed evidence of interbody fusion cage placement unilaterally as well as unilateral pedicle screw and rod construct at the L5-S1 level." Tr. at 18. He noted x-rays of Plaintiff's cervical spine "revealed multilevel disc degeneration with disc space narrowing and anterior osteophyte formation of the levels including C3–T1." *Id.*

The undersigned recommends the court find the ALJ failed to cite substantial evidence in the case record to sustain her decision to accord little weight to Dr. Poletti's September 2013 opinion. Although the ALJ determined that the restrictions Dr. Poletti imposed were inconsistent with the January 2014 examination findings and the x-ray reports, she did not explain how she reached that conclusion and a comparison of Dr. Poletti's opinion and the evidence the ALJ cited provides no clarification. Mr. Aprill's observations that Plaintiff had a slightly antalgic gait, positive SLR tests, and limited ROM in her cervical and lumbar spine and his indication that he reviewed "precautions" with her "regarding bending, lifting, and twisting" (Tr. at 18) arguably supported Dr. Poletti's opinion that Plaintiff should not lift more than 15 pounds or engage in prolonged standing or walking (Tr. at 472). The x-rays showed Plaintiff's history of lumbar fusion and ongoing problems with multilevel disc degeneration, disc space narrowing, and

osteophyte formation. Tr. at 18. Because it is not clear from the ALJ's explanation why she found this evidence inconsistent with Dr. Poletti's opinion, the undersigned recommends the court find that she failed to explain the reasons for the weight she accorded the opinion. *See* 20 C.F.R. § 404.1527(c)(2) and SSR 96-2p. In addition, the ALJ's decision does not suggest she accorded Dr. Poletti's opinion appropriate deference in light of his status as Plaintiff's treating physician and his specialization as an orthopedic spinal surgeon. *See* 20 C.F.R. § 404.1527(c)(2) and (5); SSR 96-2p.

Furthermore, the ALJ neglected to address Dr. Poletti's statements that Plaintiff was to remain out of work for the period prior to her surgery and during the recovery period. *See* Tr. at 244–46, 247, 248, 278, and 472. The Social Security Administration ("SSA") has recognized that "[i]t is not unusual for a single treating source to provide medical opinions about several issues," such as the claimant's diagnosis, prognosis, and "what she can still do." SSR 96-2p. "Although it is not necessary in every case to evaluate each treating source medical opinion separately," ALJs are required to "use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a treating source." *Id.* While the ALJ cited x-rays and records from a January 2014 examination to refute Dr. Poletti's September 2013 opinion (Tr. at 19), her decision reflects no consideration of whether Plaintiff was able to perform any work between her alleged onset date of March 13, 2012, and September 26, 2013, when Dr. Poletti released her to return to work with restrictions. Because Plaintiff's impairment and surgical recovery period lasted for more

than 12 months, the facts of the case dictated that the ALJ consider Dr. Poletti's prior opinions.

2.    Credibility Determination

Plaintiff argues the ALJ cited sufficient reasons for rejecting her statements regarding her need for a cane, but failed to provide valid reasons for rejecting her other purported limitations. [ECF No. 16 at 14]. She maintains that the evidence the ALJ cited to support her credibility finding does not actually support her conclusion. *Id.* She claims the ALJ did not examine the relevant regulatory factors in assessing her credibility. *Id.* at 15.

The Commissioner argues that the ALJ extensively discussed Plaintiff's credibility and compared her subjective complaints with the medical evidence. [ECF No. 17 at 17].

After finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce her alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the restrictions they impose on her ability to do basic work activities. SSR 96-7p.[7] If the claimant's statements about the intensity, persistence, or limiting effects of her symptoms are not substantiated by the objective medical evidence, the ALJ is required to consider

---

[7] The Social Security Administration recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p, eliminates use of the term "credibility," and clarifies that subjective symptom evaluation is not an examination of an individual's character. Because the ALJ decided this case prior to March 16, 2016, the effective date of SSR 16-3p, the court analyzes the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility. Although SSR 16-3p eliminates the assessment of credibility, it requires assessment of most of the same factors to be considered under SSR 96-7p.

the claimant's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, the ALJ should also consider the claimant's activities of daily living ("ADLs"); the location, duration, frequency, and intensity of her pain or other symptoms; factors that precipitate and aggravate her symptoms; the type, dosage, effectiveness, and side effects of her medications; treatment, other than medication, the claimant receives or has received; any measures other than treatment and medications the claimant uses or has used to relieve her pain or other symptoms; and any other relevant factors concerning the claimant's limitations and restrictions. *Id.*

The ALJ must cite specific reasons to support her finding on credibility, and her reasons must be consistent with the evidence in the case record. *Id.* Her decision must clearly indicate the weight she accorded to the claimant's statements and the reasons for that weight. *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations from pain to the other evidence of record and indicated an ALJ should explain how she decided which of a claimant's statements to believe and which to discredit. The court subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v.*

*Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of those symptoms" were "not entirely credible." Tr. at 14. She stated "[t]he claimant's subjective complaints to her physicians, the objective findings documented in her medical records, and the treatment she has required do not support a finding that her severe impairments prevent her from performing all work activity." Tr. at 15. She found that Plaintiff's testimony that she sometimes used a cane was refuted by Dr. Aymond's observation that she "had a normal heel to toe gait and the ability to heel and toe walk without difficulty," Dr. Poletti's failure to mention the need for a cane in his September 2013 statement, and her indication to Mr. Aprill that she had no leg weakness and that her leg pain did not radiate in January 2014. Tr. at 19. The ALJ also inferred from the evidence that Plaintiff was not taking her medication as prescribed. *See id.* She noted that Plaintiff had reported to Mr. Aprill that she did not take her medication if she was going to be out of the house because she did not like the way it made her feel. *Id.* She found that Plaintiff's testimony that she was "almost always at home," was contradicted by her testimony that she drove her daughter to the grocery store and her son to and from work. *Id.* Finally, she indicated "due to the claimant's extensive ADLs, lack of medical evidence, and inconsistencies in the record, I cannot find the claimant's allegations that she is incapable of all work activity to be fully credible." Tr. at 20.

Although the ALJ stated Plaintiff's subjective complaints to her physicians, the objective findings documented in her medical records, and the treatment she required did not support a finding that her impairments precluded her from performing all work activity, she failed to explain her conclusion. After making this statement, the ALJ proceeded to summarize the record and, in doing so, she cited Plaintiff's complaints of pain on numerous visits to her medical providers. *See* Tr. at 15 (referencing Plaintiff's complaints of pain to her treatment providers on July 1, 2011, August 26, 2011, September 23, 2011, February 2, 2012, March 6, 2012, and March 27, 2012), 16 (noting Plaintiff's complaints of pain in her back and lower extremities during treatment visits on June 19, 2012, August 20, 2012, August 21, 2012, September 28, 2012, October 8, 2012, January 2, 2013, and January 15, 2013), 17 (citing Plaintiff's reports of pain on March 12, 2013, March 28, 2013, May 1, 2013, and August 7, 2013), and 18 (acknowledging Plaintiff's reports of pain on September 3, 2013, October 15, 2013, and January 15, 2014).

The ALJ also referenced multiple objective findings of abnormalities throughout the record. *See* Tr. at 15 (noting Dr. Barfield's observation of "tenderness virtually everywhere"; MRI evidence of "very advanced cervical spondylosis with cord compression" and "a degenerative disc at L5-S1"; MRI evidence of "a fairly stable disc degeneration primarily at LS-S1, with disc collapse at that level causing some bilateral foraminal stenosis, worse on the right than the left; and loss of disc signal at L3-L4 and L4-L5, causing minimal collapse; and some modic changes at L5-S1"; and Dr. Barfield's observation of tenderness of the bilateral dimples of Venus), 16 (indicating that Plaintiff

ambulated with an antalgic gait during her first postoperative visit), 17 (noting that an updated MRI "revealed mild to moderate noncompressive spondylosis, and previous surgery" and indicating that Dr. Bell's examination showed Plaintiff to have decreased ROM in her hips and lumbar spine, positive SLR tests, partial ability to squat, and 3/5 muscle strength in the bilateral lower extremities), and 18 (remarking that Dr. Aymond observed Plaintiff to have reduced cervical and lumbar ROM and positive SLR tests; that x-rays showed evidence of lumbar fusion and multilevel cervical degenerative disc disease with disc space narrowing and osteophyte formation; and that Mr. Aprill observed Plaintiff to ambulate with a slightly antalgic gait, to have positive SLR tests, and to have limited ROM of her cervical and lumbar spine).

The ALJ cited evidence that showed Plaintiff pursued multiple invasive and non-invasive forms of treatment. *See* Tr. at 15 (noting prescriptions for Prednisone, Lyrica, and Mobic and multiple injections), 16 (recognizing that Plaintiff received additional injections, underwent lumbar fusion surgery, and was prescribed Zofran, Oxycodone, Zanaflex, Valium, Nucynta, Neurontin, and Cymbalta), 17 (indicating Plaintiff was referred to physical therapy and continued to take Nucynta, Cymbalta, and Zanaflex), and 18 (noting Plaintiff was taking Nucynta, Zanaflex, Cymbalta, and Lyrica).

Thus, the ALJ cited significant evidence that contradicted her conclusion that Plaintiff's complaints to her medical providers, the objective medical evidence, and her course of treatment were inconsistent with her reported limitations. She subsequently made no effort to reconcile the contradictory evidence with her conclusion.

The ALJ's credibility finding also fails to reflect consideration of Plaintiff's and Dr. Poletti's statements regarding activities that precipitated and aggravated Plaintiff's symptoms. Both Plaintiff and Dr. Poletti suggested the pain in Plaintiff's back and legs was exacerbated by lifting and prolonged standing and walking. *See* Tr. at 44, 245, 247, 248, 261, 264, 265, 387, 457, and 472. The ALJ cited sufficient evidence to support her conclusion that the record did not prove Plaintiff required the use of a cane. *See* Tr. at 19. She also referenced Plaintiff's ADLs and her indication that she did not always take her medication as prescribed to conclude that Plaintiff was not "incapable of all work activity." *See* Tr. at 19–20. However, she cited no evidence that refuted Plaintiff's and Dr. Poletti's indications that Plaintiff was incapable of prolonged standing and walking. The ALJ also cited no evidence that countered Dr. Poletti's opinion that Plaintiff was limited to lifting 15 pounds.

In light of the foregoing, the undersigned recommends the court find the ALJ failed to "build an accurate and logical bridge from the evidence" to her credibility finding. *See Monroe*, 826 F.3d at 189.

### 3.    RFC Assessment

Plaintiff argues the ALJ failed to identify evidence to support a finding that she was capable of standing and walking for six hours per day and lifting and carrying 10 pounds frequently and 20 pounds occasionally. [ECF No. 16 at 11]. She maintains that the evidence of record showed her to frequently present to her medical providers with leg and hip pain; to ambulate with an antalgic gait; to have received SI joint injections; to have positive Patrick's test; to have been diagnosed with osteoarthritis of the knee; to

demonstrate decreased ROM in her hips; and to show decreased strength in her legs. *Id.* at 11–12. In addition, she notes that the lifting restrictions Dr. Poletti imposed were inconsistent with the assessed RFC. *Id.* at 12.

The Commissioner argues the ALJ logically explained her RFC assessment and referenced the findings of the consultative examiner and the state agency consultants. [ECF No. 17 at 13]. She maintains the ALJ thoroughly discussed all the relevant evidence. *Id.* at 14–15.

To adequately assess an individual's RFC, the ALJ must determine the limitations imposed by her impairments and how those limitations affect her ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and nonsevere impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other

inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636, citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found that Plaintiff had the RFC to perform light work that required she lift and carry up to 20 pounds occasionally and 10 pounds frequently; sit for about six hours in an eight-hour workday; stand and walk for about six hours in an eight-hour workday; frequently push and pull with the bilateral lower extremities, balance, and stoop; occasionally climb ramps and stairs, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and avoid all hazards such as a machinery and heights. Tr. at 13.

The ALJ did not adequately evaluate opinion evidence from Dr. Poletti and failed to coherently explain why the record did not support additional limitations—particularly those that pertained to Plaintiff's abilities to lift and to engage in prolonged standing and walking. Although the ALJ adopted the state agency consultants' opinions that Plaintiff could lift up to 20 pounds, as opposed to Dr. Poletti's opinion that she had a 15-pound lifting restriction, she provided no cogent reason for concluding that Plaintiff could lift the additional five pounds. *See* Tr. at 19–20. She also failed to provide a rational basis for rejecting evidence of record that suggested Plaintiff could not engage in prolonged standing in favor of the state agency consultants' opinions that she could stand for about six hours during an eight-hour workday. *See id.* Therefore, her decision lacks "a narrative discussion describing how all the relevant evidence in the case record supports each conclusion" and does not adequately address Plaintiff's ability to perform relevant functions. *See* SSR 96-8p; *Mascio*, 780 F.3d at 636. In light of the foregoing, the

undersigned recommends the court find that substantial evidence does not support the ALJ's RFC assessment.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

March 22, 2017                                    Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).